Erwin J. Shustak, Esq. (ES 5617)
shustak@shufirm.com
SHUSTAK REYNOLDS & PARTNERS, P.C.
800 Third Avenue, Suite 800
New York, NY 10022
Telephone: (212) 688-5900
Facsimile: (212) 688-6151

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MITCHELL BARACK,<br><br>              Plaintiff,<br><br>       vs.<br><br>SEWARD & KISSEL, LLP,<br><br>              Defendant. | Civil Case No.:<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Mitchell Barack ("Plaintiff") alleges, upon information and belief except as otherwise stated, as follows:

### SUMMARY OF PLAINTIFF'S MALPRACTICE CLAIM AGAINST DEFENDANT SEWARD & KISSEL, LLP

1.      This is a legal malpractice action against the well-known, New York City based law firm, Seward & Kissel, LLP ("Seward & Kissel" or "Defendant"), for negligently and carelessly representing and advising Plaintiff in the sale of the common stock of his company, ESCO Energy Services Company Inc. ("ESCO"), to ForceField Energy Inc. ("ForceField").

2.      As the evidence will show, Plaintiff spent his entire adult life nurturing, growing, and making ESCO into a successful, viable and profitable company. It was the result of a lifetime of Plaintiff's hard work and dedication. It was, by far, his largest asset and represented his family's financial security. When Plaintiff decided to retire, and sell ESCO, he hired and reasonably trusted and relied upon Seward & Kissel to advise, guide and represent him and to ensure he was legally protected when he sold ESCO to ForceField. Plaintiff reasonably relied upon Seward & Kissel,

1

which holds itself out to the public as a knowledgeable, sophisticated, and experienced leader in the mid-market sale of businesses, and reasonably expected Seward & Kissel to exercise due care and expertise, particularly in light of Seward & Kissel's reputation and size, and the high fees it charged him for its services.

3. Unfortunately, as described below and as will be proven at trial, Seward & Kissel dismally failed to exercise the minimally acceptable, ordinary reasonable care, skill, and knowledge commonly possessed by a member of the legal community when it recommended Plaintiff sell his interest in ESCO to ForceField for mostly deferred payments in the form of notes, deferred compensation, and restricted stock in ForceField, which, less than six months after the closing of that sale, turned out to be a Ponzi scheme and financial scam. Seward & Kissel completely failed to detect, and ignored, numerous "red flags" that should have placed it on notice–and would have placed a competent lawyer on notice–that something was amiss with ForceField, and the entire transaction was flawed and highly risky for Plaintiff.

4. Despite the relatively straight-forward nature of the transaction, Seward & Kissel had a feeding frenzy and had at least ten timekeepers–including two partners, one of counsel, and a gaggle of associates and paralegals–collectively bill over 200 hours on the transaction and charged Plaintiff $100,000.00 for those services. Notwithstanding the exorbitant cost and amount of time Seward & Kissel representatives billed, the firm utterly failed to undertake minimal "due diligence" that would have exposed the many "red flag" risks it should have detected and of which it should have warned Plaintiff.

5. Seward & Kissel negligently failed to discover and warn Plaintiff of ForceField's history of fraudulent conduct and the numerous allegations of fraud and wrongdoing by the senior level management of the company, despite the information being readily accessible in the public domain by anyone with Internet access. Additionally, Seward & Kissel failed to inform Plaintiff that three of ForceField's top management team had been sued for securities, business, and investment fraud, and investigated by numerous government regulatory bodies, for using deceptive

tactics to artificially inflate the stock value of ForceField and other companies with which they had been associated.

6.      As a direct and proximate result of Seward & Kissel's negligence, and breach of the duty it owed to Plaintiff, Plaintiff suffered damages estimated to be in excess of $7 million.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.  The amount in controversy exceeds $75,000, exclusive of interest and costs, and complete diversity exists.

8.      Venue lies in the Southern District of New York under 28 U.S.C. § 1391 because Seward & Kissel conducts business in this district, and all the events, omissions, and acts giving rise to the claims herein occurred in this district.

## PARTIES

9.      Plaintiff Mitchell Barack is an individual who, at all times material hereto and continuing through the present, resided and resides in the State of Massachusetts.  Barack was the founder of ESCO and owned 100% of ESCO's outstanding shares.  ESCO was, at all times material hereto, an energy industry leader in the field of energy efficiency upgrades and lighting retrofit projects.

10.     Defendant Seward & Kissel, LLP is a limited liability law partnership organized, registered, and existing under the laws of the State of New York.  Seward & Kissel's principal executive office is located at One Battery Park Plaza, New York, NY 10004.  According to its website, Seward & Kissel has fifty-five attorneys it refers to as "partners".  Five of these partners have office addresses in Washington, DC, and the remaining fifty "partners" have offices in New York, NY.  Seward & Kissel's registered agent is Corporation Service Company located at 80 State Street, Albany, NY, 12207-2543.  All of the events complained of herein were performed by Seward & Kissel through its various partners, associates, and employees within the State of New York.

## FACTUAL BACKGROUND

### Plaintiff Retains Seward & Kissel

11.     In or about July 2014, Plaintiff spoke with James Abbott ("Abbott"), a Seward & Kissel partner in the firm's New York office, and discussed retaining the firm to represent him in connection with the potential sale of his shares of common stock in ESCO to ForceField.  At the time, ForceField was a new, small, publicly-traded company whose shares were listed on the NASDAQ stock market exchange, and whose principal management team were Canadian. Plaintiff asked Abbot about Seward & Kissel and its expertise and experience.  Abbott told Plaintiff that Seward & Kissel has handled many transactions similar to his and such transactions, Abbot assured him, are Seward & Kissel's "specialty."  Seward & Kissel, through Abbott, assured Plaintiff it would and could competently and expertly represent, advise, and protect him from the risks of the transaction.  Seward & Kissel assured Plaintiff its attorneys possessed the expertise and experience to handle all aspects of the transaction and could properly and competently advise him from the beginning through the closing of the transaction.

12.     The information Abbott provided was consistent with what Plaintiff read on Seward & Kissel's website and in other marketing materials.

13.     According to its website, Seward & Kissel is a well-known law firm that traces its roots to 1890, and its attorneys "are experienced in all aspects of purchase, sale, merger and other M&A transactions, including structuring, financing, due diligence, contract negotiation and closing."  Seward & Kissel holds itself out as "very experienced and highly regarded" in its practice areas.

14.     Based on Seward & Kissel's representations, Plaintiff agreed to retain the firm to advise him through the process of negotiating for the sale and ultimate sale of all his shares in ESCO, his life's work and primary family asset.  In late July, 2014, Plaintiff, ESCO, and Seward & Kissel executed an engagement letter ("Engagement Letter") defining the clients and the scope of the services.  The Engagement Letter describes the "client" as "ESCO and its stockholders."  A

copy of the Engagement Letter is attached as *Exhibit A*.  At the time, Plaintiff was ESCO's sole stockholder.

15. The Engagement Letter defines the scope of the services to be rendered by Seward & Kissel, as:

> Representation of the Client as lead transaction counsel in connection with the proposed sale of the Client's common stock to ForceField Energy Inc. and related agreements, documents and transactions.

## Seward & Kissel Provides Legal Advice to Plaintiff

16. In connection with the transaction, among other tasks, Seward & Kissel undertook to perform, and did perform, what it describes in its invoices as "due diligence" research.  According to those invoices, all the "due diligence" work was done by an "associate" attorney, Amit Raviv ("Raviv").  According to Seward & Kissel's website and the New York State Bar's website, however, Raviv graduated law school in 2013, but was not admitted to practice law in New York until 2015, *after* the events complained of herein.  All Raviv's work was performed in the fall of 2014, months *before* he became licensed to practice law in New York (or anywhere else) and approximately one year after he graduated law school.

17. Between October 8, 2014 through October 15, 2014, Raviv performed "due diligence" research for the transaction on six occasions for a total of 28.50 hours.  Raviv was not a licensed attorney at the time and was inexperienced in corporate transactions and had little experience or expertise in performing due diligence, specifically in connection with a stock sale of a company like ESCO for mostly deferred compensation, restricted shares of stock and notes in the acquiring company.  Although Raviv was not a licensed attorney when he rendered services for Plaintiff, Seward & Kissel billed for his time as an "associate."

18. Seward & Kissel had at least ten people working on–and billing for–the work the firm performed on the transaction, including two partners, one of counsel, five associates, and two paralegals.  According to the firm's invoices and billing statements, however, only Raviv

5

conducted any "due diligence." None of his work was directly supervised or reviewed by any of the partners or the of counsel who worked on the transaction.

19. Instead, the only supervision of Raviv's "due diligence" was one meeting Raviv had with a second-year associate, Danielle Lemberg ("Lemberg"). On October 8, 2014, Lemberg had a "conference with Mr. Raviv on [the] due diligence process," but, according to Defendant's billing records, she never followed up or reviewed any of his work. Seward & Kissel failed to properly supervise the young attorneys to whom the firm delegated the entire "due diligence" process. It is the firm's total failure to perform reasonably competent "due diligence" that directly and proximately caused Plaintiff's loss and damage.

20. At no time did Seward & Kissel discover or inform Plaintiff that ForceField was, and its principal management had a history of utilizing unethical, deceptive and illegal financial machinations to artificially inflate and manipulate its stock price; had questionable financing backed by foreign investors; that three members of ForceField's top management team had significant, reported ties to companies charged with and sued for fraud and market manipulation; and at least three members of ForceField's top management team were personally sued and investigated for prior, similar market manipulation and fraudulent conduct.

### Seward & Kissel Advises Plaintiff to Proceed With the Transaction

21. Relying on Seward & Kissel's advice, Plaintiff contracted to sell all of his shares of ESCO to ForceField on October 17, 2014, for $7.5 million. The $7.5 million included $1 million in cash at closing; $2.5 million in restricted common stock in ForceField; two deferred payment notes secured only by ForceField's assets; and an employment agreement wherein Plaintiff was to be employed by ForceField for an annual base salary of $175,000.00, plus bonuses and benefits for an initial term of two years. ForceField also agreed to fund a line of credit to ensure ESCO's liquidity in the future.

22. Seward & Kissel advised Plaintiff to proceed with the transaction and closing and, thereafter, ESCO became a wholly owned subsidiary of ForceField. Over 80% of the sale price for Plaintiff's life's work–his ESCO stock–was deferred and depended entirely on ForceField's

continued viability and creditworthiness. Plaintiff proceeded with the transaction relying completely and totally on Seward & Kissel's legal advice and guidance.

23. Following the closing, Seward & Kissel, obviously pleased and proud of the services the firm provided to Plaintiff, issued a press release on October 20, 2014, touting its involvement with the ESCO sale to ForceField. A copy of that press release is attached as *Exhibit B*. In that press release, Seward & Kissel boasted of its expertise and experience. In part, the press release, written and published by Seward & Kissel, reads as follows:

> Seward & Kissel LLP…is a leading New York law firm, originally established in 1890, offering legal advice emphasizing business, financial and commercial law and related litigation. The firm's Business Transactions Group handles middle-market M&A, private equity, venture capital and joint venture transactions involving a wide variety of industries. The firm is ranked as Highly Regarded for Corporate/M&A by Chambers USA and is highly recommended by The Legal 500 in the middle-market M&A category….

**Six Months After Closing, ForceField Was Exposed as a Ponzi-Scheme; ForceField's Executive Chairman St. Julien Was Arrested; ForceField's Public Trading Was Suspended; and Numerous Civil Actions Were Filed Against ForceField and Its Management Team**

24. The sale transaction closed on October 17, 2014. Less than six months later, on April 17, 2015, the Executive Chairman of ForceField's Board of Directors, Richard St. Julien ("St. Julien"), was arrested and charged for securities fraud and conspiracy by the United States Department of Justice.

25. Also on April 17, 2015, a securities fraud class action lawsuit was filed in the Southern District of New York against ForceField, St. Julien, ForceField's Chief Executive Officer David Natan ("Natan"), and ForceField's Chief Financial Officer Jason Williams ("Williams") alleging violations of the Federal Securities Laws and fraud. *Atkinson v. ForceField Energy, Inc., et al.,* Case No. 1:15-CV-03020-NRB (S.D.N.Y).

26. News of St. Julien's widely publicized arrest and the class action lawsuit against ForceField and members of its senior management decimated ForceField's business and stock price.

7

27.     On April 21, 2015, the Securities and Exchange Commission ("SEC") suspended ForceField's trading on the stock market for ten days due to concerns about stock price manipulation and the accuracy of public information regarding funding provided to investors. Shortly thereafter, ForceField voluntarily de-listed itself from public trading on the NASDAQ OTC market.  The SEC began an investigation into ForceField and its management, and on May 5, 2016, based on its findings, the SEC filed a complaint against St. Julien and others for their role in the ForceField Ponzi scheme.  *SEC v. St. Julien, et al.*, Case No. 1:16-CV-02193 (E.D.N.Y).

28.     Thereafter, ForceField was unable to fund several of its commitments including the agreed upon line of credit for ESCO and re-payment of the notes to Plaintiff.  The $2.5 million in restricted common stock, and the $4 million of ForceField notes issued to Plaintiff as part of the purchase price for his shares in ESCO became worthless.  In addition, ForceField no longer employed or paid Plaintiff under the terms of his employment agreement.  Essentially, of the $7.5 million of consideration Plaintiff was to receive for his ESCO shares, more than $6.5 million of the deferred consideration became worthless within six months after the closing of the transaction.

29.     These events forced Plaintiff to negotiate to buy back ESCO at a "fire sale" price and significant loss on July 1, 2015, a mere nine months after Seward & Kissel advised Plaintiff to proceed with the transaction.

### Publicly Available Information Regarding ForceField as of October 2014

30.     As of October 2014, readily accessible and publicly available information revealed that ForceField's three top managers, and their past business endeavors, had extensive ties to securities, business, and investment fraud, large, unpaid debts, and had been investigated by the SEC, the Federal Bureau of Investigations, the United States Senate, and the Canadian Federal Government.  Publicly available information also highlighted and raised numerous and significant, material "red flags" regarding the illegal, fraudulent, and manipulative practices that ForceField and its senior management used to artificially inflate its stock price.

31.     ForceField was a nascent publicly traded company.  Its shares did not start to trade on NASDQ until the fall of 2013, approximately one year before Plaintiff hired Seward & Kissel

to represent him.  In February, 2013, ForceField, which until then had been known as SunSi Energies, Inc., changed its name to ForceField.  When Plaintiff retained Defendant to represent him in the most important business transaction of his and his family's lives, Defendant knew, or should have known, that ForceField had a very limited history of being a publicly reporting and trading company.  It also knew, or should have known, that less than 18 months before Plaintiff retained Defendant, ForceField had been a different company, in a different business operating under a different name.  All of these facts, and more, should have placed Seward & Kissel on notice that particular inquiry and investigation should be undertaken regarding ForceField and its senior management before counseling Plaintiff to sell his life's work for mostly deferred payments and restricted common stock in ForceField.

32. In October 2014–while Seward & Kissel was having unlicensed, first-year associate Raviv undertake all "due diligence" on the transaction–a simple Internet search of St. Julien would have uncovered numerous news articles chronicling St. Julien's history of involvement with questionable and insolvent companies, client complaints, and allegations of his complicity in helping clients hide and secrete assets.

33. As just one example, in 2009, it was widely publicized that St. Julien was tied to a fraudulent scheme to funnel money for a third-party to hide assets during that person's bankruptcy proceedings in Canada.  An article dated April 23, 2009, appears on the first page of Google search results and notes St. Julien was under a Canadian federal investigation for refusing, during the bankruptcy proceeding, "… to explain what happened to $460,000 from the house sale that was invested in his Belize company, Parameter, which is now insolvent." [1]

34. Another article, published on October 10, 2014–one week before the closing and ten days before the Seward & Kissel glowing press release about its work on the ESCO stock sale– also available through a simple Internet search of St. Julien, reported that St. Julien left Canada for

---

[1] Daniel Leblanc, *Lafleur May Face Expanded Suit,* The Globe and Mail, Apr. 23, 2009,
    http://www.theglobeandmail.com/news/national/lafleur-may-face-expanded-suit/article4273107/.

Costa Rica and New York with unpaid debts in Quebec.[2]  The article also raised concerns about the stability of the financing ForceField secured in Mexico.

35.  In the fall of 2014, a simple search of PACER, the national database for federal litigations which can be searched by many criteria including simple name searches, would have revealed that in 2006 ForceField's CEO, Natan, was a named defendant in a number of securities fraud and shareholder derivative actions that ultimately were consolidated before one federal court, involving a company in which he was a principal, called SFBC International ("SFBC"). *In re SFBC International, Inc. Securities & Derivative Litigation,* Case No. 2:06-CV-00165-SRC (D.N.J.).  Prior to forming ForceField, Natan was the Chief Financial Officer of SFBC and was sued for his part in SFBC's fraudulent practices.  Specifically, he was charged with making false representations to the SEC and violating various securities laws.

36.  The many lawsuits against Natan were a matter of readily accessible public records and readily available via a search of PACER, of which Seward & Kissel is a subscriber.  That information would have been obtained within a few minutes of searching the names of the top management of ForceField, including Natan.

[*This space intentionally left blank.*]

---

[2] Thom Calandra, *Lighting Up: LED Stock Green for Now*. The Calandra Report, Oct. 10, 2014, http://thomcalandra.com/lighting-up-led-stock-is-green/.

37. As of September/October 2014, six of the first ten results of an Internet search of SFBC would have revealed financial misconduct, Senate inquiries, and numerous securities law and fraud litigations involving SFBC, Natan, and others.



11

38. Bloomberg published an expose entitled "Big Pharma's Shameful Secret" in December, 2005, which described, in detail, how SFBC recruited low-income, non-English speaking immigrants to act as guinea pigs in clinical trials for drugs not approved by the U.S. Food and Drug Administration.[3] This article also could have been found by Seward & Kissel through a simple Internet search of Natan and SFBC.

39. ForceField's CFO, Williams, also was involved with SFBC before joining ForceField. Williams was part of PharmaNet Development Group's management team from July 2002 through August 2007. A 2006 article, readily available on the Internet, notes that PharmaNet is the same SFBC that was investigated for fraud in 2006 and that SFBC had changed its name to distance itself from the negative press associated with the lawsuit and Senate inquiries.[4]

40. On March 20, 2014, just a handful of months before Plaintiff retained Seward & Kissel, *Fortune.com* published an article that highlighted ForceField's potentially fraudulent conduct in paying promoters to pose as unbiased parties to drive up its stock price.[5] That article also was publicly available through a simple Internet search.

41. Seward & Kissel failed to discover, through reasonable inquiry, and inform Plaintiff of the substantial risks associated with doing business with ForceField, specifically its management's extensive record of and connection with allegations of fraud and deceptive financial machinations, amongst other, negative conduct. More specifically, Seward & Kissel failed to discover and warn Plaintiff of the high probability that ForceField was a potential Ponzi-scheme and might not be able to make the deferred payments to Plaintiff in the future, and the high degree of risk Plaintiff faced by agreeing to sell his stock in ESCO to ForceField for anything other than an all cash transaction.

---

[3] David Evans, *Big Pharma's Shameful Secret,* Bloomberg Markets, Dec. 2005, http://www.dcscience.net/pharma-bloomberg.pdf.

[4] Kristy Barnes, *Troubled SFBC Changes Its Name in Hope of Changing Its Fortunes*, Outsourcing-Pharma, Aug. 31, 2006, http://www.outsourcing-pharma.com/Clinical-Development/Troubled-SFBC-changes-its-name-in-hope-of-changing-its-fortunes.

[5] Stephen Gandel, *At financial News Sites, Stock Promoters Make Inroads,* Fortune.com, March 20, 2014, http://fortune.com/2014/03/20/at-financial-news-sites-stock-promoters-make-inroads/.

42. Seward & Kissel failed to perform adequate due diligence and did not take reasonable steps to discover and warn Plaintiff of the potential risks of selling his company to ForceField in light of the readily available articles and litigation history involving ForceField and its top management.

## **Damage to Plaintiff**

43. As a result of Seward & Kissel's negligence, carelessness, and malpractice, Plaintiff suffered a loss estimated to be in excess of $7 million, which includes the losses sustained on the sale, and the Plaintiff's subsequent repurchase, and sale of assets, on a "fire sale" basis, of ESCO, the now-uncollectible notes, the loss of Plaintiff's employment contract, and the legal fees he incurred both in connection with the sale of his ESCO stock and the buyback of ESCO. In all, Seward & Kissel charged Plaintiff over $150,000.00 for its careless, negligent, and substandard work and advice- $100,000.00 for the firm's services in connection with the sale of Plaintiff's ESCO stock, and another $50,000.00 in connection with representing him in his "fire-sale" repurchase of that same stock after ForceField was exposed to the world as a Ponzi scheme and fraud.

44. Those losses are a direct and proximate result of Seward & Kissel's failure to conduct proper due diligence and investigation of ForceField. Plaintiff was inexperienced in this type of transaction and reasonably relied on Seward & Kissel to investigate the potential risks of the transaction with ForceField and properly advise him of those risks.

45. Had Seward & Kissel conducted a proper due diligence investigation, or even performed simple Google and Pacer searches of the Chairman of the Board, the CEO, or the CFO, it would have uncovered numerous material and negative "red flags" about ForceField and its top management, and could have and should have warned Plaintiff about the substantial risks of proceeding with the stock sale transaction. Had Seward & Kissel discovered this information and communicated these risks to Plaintiff, he would not have proceeded with the transaction.

## **PLAINTIFF'S CLAIM FOR RELIEF AGAINST DEFENDANT**

### **Legal Malpractice**

46. Plaintiff repeats and realleges each and every allegation set forth above as if set forth at length herein.

47. At all times herein mentioned, Seward & Kissel maintained an attorney-client relationship with Plaintiff to advise and represent him in conjunction with the sale of his common stock in ESCO to ForceField.

48. Seward & Kissel had a duty to use such skill, prudence, and diligence as members of the legal profession commonly possess and exercise in providing legal services to Plaintiff.

49. Seward & Kissel knew Plaintiff was relying on its advice, and that Plaintiff would rely on this advice in deciding to sell his shares of ESCO to ForceField. Despite this knowledge, Seward & Kissel failed to exercise ordinary care, skill, and diligence in its representation of Plaintiff.

50. Seward & Kissel further violated its professional obligations to Plaintiff when it failed to adequately supervise the young, inexperienced attorneys who worked on the transaction. This failure violated Seward & Kissel's professional duties to Plaintiff and violated the New York Rules of Professional Conduct, Rule 5.1, subsection c, which provides that "A lawyer with direct supervisory authority over another lawyer shall adequately supervise the work of the other lawyer." N.Y. Rules. Prof. Conduct, R. 5.1(c).

51. Seward & Kissel further violated its professional obligations to Plaintiff when it failed to adequately supervise Raviv's work on the transaction. This failure violated Seward & Kissel's professional duties to Plaintiff and violated the New York Rules of Professional Conduct, Rule 5.3, subsection a, which provides that "A law firm shall ensure that the work of nonlawyers who work for the firm is adequately supervised." N.Y. Rules. Prof. Conduct, R. 5.3(a).

52. Seward & Kissel further violated its professional obligations to Plaintiff when it allowed an unlicensed lawyer, Raviv, to hold himself out as a lawyer and billed for his time as an "associate." This violated Seward & Kissel's professional duties to Plaintiff and violated the New

York Rules of Professional Conduct, Rule 5.5, subsection b, which provides that "A lawyer shall not aid a nonlawyer in the unauthorized practice of law." N.Y. Rules. Prof. Conduct, R. 5.5(b).

53. Seward & Kissel's professional negligence was the direct and proximate cause of substantial damage to Plaintiff.

54. Plaintiff is entitled to recover monetary and other appropriate damages from Seward & Kissel, in an amount to be determined at trial or by the Court but which is estimated to be in excess of $7 million.

## REQUEST FOR JURY TRIAL

Plaintiff hereby demands a trial of this action by jury, on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court:

i. Enter judgment in favor of Plaintiff and against Defendant in an amount to be proven at the time of trial, which amount is estimated to be in excess of $7 million;

ii. For interest in the maximum amount allowable by law;

iii. For costs of suit incurred herein; and

iv. Grant such other and further relief as is just, proper and equitable.

Signed this 14th day of December, 2016.

Submitted by,

SHUSTAK REYNOLDS & PARTNERS, P.C.
ERWIN J. SHUSTAK, ESQ.

*/s/ Erwin J. Shustak*
Erwin J. Shustak (ES 5617)
Shustak@shufirm.com
800 Third Avenue, Suite 800
New York, NY 10022
Telephone: (212) 688-5900
Facsimile: (212) 688-6151

Attorneys for Plaintiff

15

Of Counsel

SHUSTAK REYNOLDS & PARTNERS, P.C.
PAUL REYNOLDS, ESQ.
KELLY E. MOURNING, ESQ.
401 West "A" Street, Suite 2250
San Diego, CA 92101
Telephone: (619) 696-9500
Facsimile: (619) 615-5290