UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

MITCHELL BARACK,

                    Plaintiff,

            -against-

SEWARD & KISSEL, LLP,

                    Defendant.

------------------------------------------------------------

16cv9664

OPINION & ORDER

WILLIAM H. PAULEY III, District Judge:

        Mitchell Barack brings this legal malpractice action against the law firm Seward & Kissel, LLP. Barack seeks damages for Seward & Kissel's alleged malpractice in negligently advising him on the sale of his company. Seward & Kissel moves to dismiss the complaint under Fed. R. Civ. P. 12(b)(6). For the following reasons, Seward & Kissel's motion to dismiss is denied.

BACKGROUND

        The allegations in the First Amended Complaint ("Complaint" or "FAC") are presumed true for the purposes of this motion. The Complaint asserts a single legal malpractice claim arising out of a corporate transaction gone awry. Barack was the founder and sole owner of ESCO Energy Services Company Inc. ("ESCO"), a Massachusetts corporation in the business of "energy efficiency upgrades and lighting retrofit projects." (FAC ¶ 9.) Approaching retirement, Barack retained BCMS Capital Advisors, Inc. ("BCMS"), to assist with locating a suitable purchaser for ESCO. (FAC ¶¶ 2, 45.)

        On July 21, 2014, Barack executed a letter of intent to sell ESCO to ForceField Energy, Inc. ("ForceField"). (FAC ¶ 14; see Ex. A to Declaration of Maria H. Keane, ECF No.

-1-

28 ("Keane Decl.").[1]) The letter of intent memorialized the pricing terms, under which Barack would receive a total minimum purchase consideration of $7.5 million, consisting of $2.5 million in cash, $2.5 million in a deferred payment note collateralized by ForceField's restricted common stock, and $2.5 million in ForceField's restricted common stock. (Keane Decl. Ex. A, § 1(a).) Under the letter of intent, ESCO was also not obligated to consummate the transaction. (Keane Decl. Ex. A, § 10(c).) Finally, the letter of intent contained a provision permitting—but not requiring—each party, its accountants, its attorneys, and other advisers to "conduct a thorough due diligence examination" of the other party. (Keane Decl. Ex. A, § 7.)

That same day, on BCMS' referral, Barack approached Seward & Kissel to represent him in connection with the potential stock sale of ESCO to ForceField. (FAC ¶¶ 11, 45.) Seward & Kissel assured Barack that it had the competence, experience, and expertise in handling all aspects of the type of corporate transaction that Barack was contemplating from the beginning to the close of the deal, which included protecting Barack from the risks of the transaction. (FAC ¶ 11.) As a result, Barack, ESCO, and Seward & Kissel executed an engagement letter on July 21, 2014 (the "Engagement Letter") that defined ESCO and Barack as the client and described the scope of representation as follows:

> Representation of the Client as lead transaction counsel in connection with the proposed sale of Client's common stock to ForceField Energy, Inc. and related agreements, documents and transactions.

(FAC ¶¶ 14-15; Keane Decl. Ex. B.)

---

[1] On a motion to dismiss, a court may "consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff upon which it relied in bringing the suit." Tongue v. Sanofi, 816 F.3d 199, 209 (2d Cir. 2016). Exhibits B-H are explicitly quoted or referenced by the Complaint. (FAC ¶¶ 14-16, 18, 35-36, 40-42.) Although this July 21, 2014 letter of intent is not expressly referenced in the Complaint, the Complaint relies upon information contained within that letter, including the transaction's payment terms. (E.g., FAC ¶¶ 21-22.) Accordingly, this Court may consider the exhibits accompanying the Keane Declaration.

Seward & Kissel's invoices reflect that between October 8, 2014 and October 15, 2014, it conducted 28.5 hours of due diligence for the ESCO-ForceField transaction. (FAC ¶ 17.) While Seward & Kissel performed due diligence on ESCO, it did none for ForceField, nor did it discuss with Barack what due diligence it could, would, or should do on ForceField. (FAC ¶¶ 17, 43-44.) Barack alleges that if Seward & Kissel had performed due diligence, it would have discovered several publicly available "red flags" regarding fraud and financial misconduct by ForceField executives, including the manipulation of ForceField's stock price. (FAC ¶¶ 31, 34-42.)

Less than a week before the transaction closed, ForceField informed Seward & Kissel that it did not have sufficient cash to pay Barack the $2.5 million cash payment at closing, and instead sought to defer $1.5 million of that amount to several months after the consummation of the deal. (FAC ¶ 22.) Seward & Kissel relayed this information to Barack, who inquired about the implications of ForceField's lack of cash and whether he should still proceed with the transaction. (FAC ¶ 22.) In response, Seward & Kissel advised Barack to proceed with the closing and rely on ForceField's promise that the remaining $1.5 million of the cash payment would come later, reassuring him that the lack of cash was "routine" and "not unusual." (FAC ¶ 22.) Despite knowledge of ForceField's ostensible financial troubles, Seward & Kissel still did not perform any due diligence on the purchaser. (FAC ¶¶ 43-44.)

The ESCO-ForceField transaction closed on October 17, 2014. (FAC ¶ 21.) At that time, ESCO had a fair market value between $8 million and $12 million. (FAC ¶ 49.) Barack received a $1 million cash payment, $2.5 million in ForceField's restricted common stock, and $4 million in deferred payment notes secured by ForceField's assets. (FAC ¶¶ 21, 29.) Under the terms of the transaction, Barack was to receive a $175,000 salary, along with

benefits and bonuses, for at least two years. (FAC ¶ 21.) Finally, ForceField agreed to fund a line of credit to ensure ESCO's liquidity in the future. (FAC ¶ 21.) For its work on the transaction, Seward & Kissel charged Barack $100,000. (FAC ¶ 49.)

Roughly six months after the closing, a chain of events hamstrung ForceField's ability to meet its deferred funding commitments. On April 17, 2015, the Executive Chairman of ForceField's Board of Directors, Richard St. Julien, was arrested and charged with securities fraud and conspiracy. (FAC ¶ 25.) That same day, a securities fraud class action lawsuit was filed against ForceField and some of its senior management. (FAC ¶ 25.) After this news broke, ForceField's stock price plummeted. Around the same time, the SEC suspended the public trading of ForceField's shares based on concerns about stock market manipulation and the accuracy of information provided to investors, and ultimately, ForceField delisted itself from public trading. (FAC ¶ 28.) These events rendered Barack's restricted stock and deferred payment notes worthless. (FAC ¶ 29.) Additionally, ForceField could no longer fund the promised line of credit or satisfy its obligation to pay Barack the $175,000 annual salary. (FAC ¶ 29.) As a result, Barack repurchased ESCO at a "fire sale" price of $900,000 on July 1, 2015 and resold it to another buyer for $1 million—a mere fraction of the $7.5 million in compensation that was originally negotiated. (FAC ¶ 30.) Seward & Kissel charged Barack another $50,000 for representing him in this repurchase. (FAC ¶ 49.)

## LEGAL STANDARD

On a motion to dismiss under Rule 12(b)(6), the factual allegations in a complaint are accepted as true and all reasonable inferences are drawn in the plaintiff's favor. Gonzalez v. Hasty, 802 F.3d 212, 219 (2d Cir. 2015). To survive a motion to dismiss, the complaint "must contain sufficient factual matter" to "state a claim to relief that is plausible on its face." Ashcroft

v. Iqbal, 556 U.S. 663, 678 (2009) (citation omitted). In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). A pleading that merely recites conclusory allegations or a "formulaic recitation of the elements of a cause of action" fails to state a claim. Iqbal, 556 U.S. at 678 (citation omitted).

## DISCUSSION

In a diversity action for legal malpractice, state substantive law applies. Nordwind v. Rowland, 584 F.3d 420, 429 (2d Cir. 2009). The parties assume that New York law governs, and accordingly, this Court applies the substantive law of New York. See Joseph DelGreco & Co. v. DLA Piper L.L.P. (U.S.), 899 F. Supp. 2d 268, 276 (S.D.N.Y. 2012). To state a claim for legal malpractice under New York law, a plaintiff must allege: (1) negligence on the part of the attorney; (2) that the negligence is the proximate cause of plaintiff's injury; and (3) actual, ascertainable damages. Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d 328, 337 (2d Cir. 2006); see also Janker v. Silver, Forrester & Lesser, P.C., 24 N.Y.S.3d 182, 184 (N.Y. App. Div. 2016).[2]

I.  Negligence

The negligence prong requires the plaintiff to allege that the attorney's conduct "fell below the ordinary and reasonable skill and knowledge commonly possessed by a member of his profession." Achtman, 464 F.3d at 337 (quotation marks omitted). The standard to which the attorney's conduct is compared is "not that of the most highly skilled attorney," but that of a "competent and qualified" attorney. Bua v. Purcell & Ingrao, P.C., 952 N.Y.S.2d 592, 597 (N.Y.

---

[2] The parties spar over the extent to which the alleged violations of various provisions of the New York Rules of Professional Conduct constitute actionable legal malpractice. But because Barack concedes that the alleged violations are simply additional facts that support the single cause of action for malpractice, and Barack has stated a cause of action for malpractice, this Court need not address those arguments.

App. Div. 2012). Expert testimony is "normally needed to establish that the attorney" fell below this standard. Healy v. Finz & Finz, P.C., 918 N.Y.S.2d 500, 502 (N.Y. App. Div. 2011). Moreover, an attorney is generally "not a guarantor of a particular result, and may not be held 'liable in negligence for . . . the exercise of appropriate judgment that leads to an unsuccessful result.'" Bua, 952 N.Y.S.2d at 597. In other words, a complaint that merely alleges an "error of judgment" or a "selection of one among several reasonable courses of action" fails to state a claim for malpractice. Achtman, 464 F.3d at 337.

Seward & Kissel contends that Barack fails to plead the negligence prong, arguing in essence that it cannot be held responsible for advising on the prudence of a business decision, and that because it was retained only to close the sale of ESCO to ForceField, the scope of its representation did not include due diligence on ForceField. As an initial matter, the scope of Seward & Kissel's representation set forth in the Engagement Letter is facially broad and contemplates without qualification that Seward & Kissel will serve as "lead transaction counsel" for the proposed transaction "and related agreements, documents and transactions." (FAC ¶¶ 14-15; Keane Decl. Ex. B.) Nowhere does the Engagement Letter explicitly carve out specific due diligence responsibilities from Seward & Kissel's retention. Nor does the Engagement Letter define "lead transaction counsel" or shed additional light on the scope of Seward & Kissel's responsibilities. But at least one case from this Circuit illustrates that the scope of transaction counsel's responsibilities is broader than that which Seward & Kissel proposes. See Schweizer v. Sikorsky Aircraft Corp., 10-cv-6547, 2014 WL 5460504, at *10 (W.D.N.Y. Oct. 27, 2014) (observing that the seller's transaction counsel also negotiated specific language in a stock purchase agreement).

Seward & Kissel points to AmBase Corp. v. Davis Polk & Wardwell to support

the proposition that it cannot be held liable for failing to act outside the scope of its retention. But Seward & Kissel's reliance on AmBase is misplaced. In that case, AmBase was embroiled in a tax dispute with the IRS and brought a malpractice action against Davis Polk for that law firm's alleged failure to advise that certain tax liability belonged to a third party. AmBase Corp. v. Davis Polk & Wardwell, 866 N.E.2d 1033, 1036-37 (N.Y. 2007). In finding that Davis Polk "exercised the ordinary reasonable skill and knowledge commonly possessed," the Court of Appeals explained that "[t]he plain language of the retainer agreement indicates that Davis Polk was retained to litigate the amount of tax liability and not to determine whether the tax liability could be allocated to another entity." AmBase Corp., 866 N.E.2d at 1037. Here, by contrast, the Engagement Letter does not contain any similar specification of the scope of Seward & Kissel's representation—much less a clear one.

Indeed, the July 21, 2014 letter of intent and Seward & Kissel's own invoices raise the inference that "competent and qualified" transaction counsel might be expected to conduct some due diligence on ForceField, or at the very least communicate with Barack about the scope of due diligence to be conducted. While the July 21, 2014 letter of intent does not require due diligence to be conducted on ForceField, it certainly contemplates that ESCO's attorneys may do so. (Keane Decl. Ex. A, § 7.) And according to Seward & Kissel's invoices, it even reviewed and discussed a draft of the letter of intent. (Keane Decl. Ex. C, at 2.) Moreover, these invoices reflect that four of its attorneys reviewed, revised, drafted, or provided comments on the stock purchase agreement between October 3, 2014 and October 15, 2014, suggesting that Seward & Kissel may have played a part in negotiating the terms of the agreement. (See Keane Decl. Ex. C, at 2.) Finally, Seward & Kissel's invoices reveal that on August 5, 2014, it "review[ed] ForceField Energy information and prior deal documents." (Keane Decl. Ex. C, at

2.) Thus, on these allegations, Seward & Kissel may have had a duty to conduct due diligence on ForceField, or at minimum, discuss with Barack what and how much diligence was appropriate. Cf. Campbell v. Fine, Olin & Anderson, P.C., 642 N.Y.S.2d 819, 821 (N.Y. Sup. Ct. 1996) (observing that "an attorney has an affirmative duty to ensure that the client understands any limits imposed by the attorney on the extent of the work to be performed").

Drawing all reasonable inferences in Barack's favor, the Complaint plausibly alleges that Seward & Kissel's conduct fell below the ordinary and reasonable skill and knowledge possessed by a member of the legal profession by neglecting to perform any due diligence on ForceField or even communicate with Barack about the amount of due diligence it could or should perform. Accord Sohns v. Little Prince Prods., Ltd., 791 F. Supp. 88, 93 (S.D.N.Y. 1992) (finding that corporate client had stated legal malpractice claim against attorney based in part on allegations that the attorney failed to conduct a due diligence investigation of the proposed merger partner and its past business dealings).

II.     Proximate Cause

An attorney's "conduct or inaction is the proximate cause of a plaintiff's damages if 'but for' the attorney's negligence the plaintiff . . . would not have sustained 'actual and ascertainable' damages." Nomura Asset Capital Corp. v. Cadwalader, Wickersham & Taft LLP, 41 N.E.3d 353, 360 (N.Y. 2015) (citations omitted) (quotation mark omitted). Stated differently, the "but for" prong "demands a hypothetical re-examination of the events at issue absent the alleged malpractice." Even Street Prods., Ltd. v. Shkat Arrow Hafer & Weber, LLP, 643 F. Supp. 2d 317, 322 (S.D.N.Y. 2008). The proximate cause requirement is a "high bar to attorney malpractice liability, seek[ing] to insure a tight causal relationship exists between the claimed injuries and the alleged malpractice." Farrell Family Ventures, LLC v. Sekas & Assocs., LLC,

863 F. Supp. 2d 324, 330 (S.D.N.Y. 2012). But at the motion to dismiss stage, Barack "need[s] only [to] allege, not prove," the proximate cause prong of his claim. Even Street Prods., Ltd., 643 F. Supp. 2d at 322. To adequately plead causation, the Complaint must allege that if Seward & Kissel had conducted adequate due diligence on ForceField, Barack would not have sustained damages.

Here, Barack alleges explicitly that he would not have sold ESCO to ForceField had Seward & Kissel advised him of the "red flags" relating to ForceField and its senior management. (FAC ¶¶ 4, 51, 55.) While a hypothetical chain of speculative future events is "insufficient to establish that the defendant lawyer's malpractice, if any, was a proximate cause of any such loss," Brooks v. Lewin, 800 N.Y.S.2d 695, 698 (N.Y. App. Div. 2005), there is no such chain of attenuation here. These allegations are sufficient to survive a motion to dismiss.

Tellingly, Seward & Kissel does not contest that the Complaint alleges that had Seward & Kissel conducted adequate due diligence, Barack would not have proceeded with the transaction and subsequently incurred damages. Instead, the crux of Seward & Kissel's argument is that its inaction cannot constitute the "but for" cause of Barack's damages either because it is negated by Barack's own knowledge of the red flags concerning ForceField or because it is otherwise superseded by the fraud perpetrated by ForceField's senior managers. But neither of Seward & Kissel's arguments is availing.³

First, Seward & Kissel urges that Barack's own awareness or possession of "red flag" information about ForceField and its senior managers precludes Seward & Kissel's failure to identify those red flags from being the "but for" cause, citing Macquarie Capital (USA) Inc. v.

---

³ Seward & Kissel also argues that inaction outside the scope of the representation cannot support "but for" causation. However, because Barack has plausibly alleged that Seward & Kissel's failure to perform due diligence on ForceField falls within the scope of the representation, this Court need not address this argument at the pleading stage.

Morrison & Foerster LLP, Index No. 650988/2015, 2016 WL 3927648 (N.Y. Sup. Ct. July 14, 2016). Specifically, Seward & Kissel points to three examples of red flags known or possessed by Barack: (1) that ForceField was a small company; (2) that ForceField had a limited operating and reporting history; and (3) that ForceField lacked the cash to meet its closing obligations. But as Seward & Kissel concedes, having a limited operating and reporting history is not itself a red flag, and simply having a small capitalization is not necessarily one either. Moreover, while the Complaint alleges that Barack learned that ForceField lacked the cash to close, the essence of those allegations is not that Seward & Kissel should have discovered this red flag and brought it to Barack's attention, but that Seward & Kissel should have performed some due diligence on ForceField after learning this information instead of advising Barack to proceed with the transaction. As for the other red flags, there is no indication from the Complaint and exhibits to the Keane Declaration that Barack actually knew of or "indisputably possessed" that information. See Macquarie Capital (USA) Inc., 2016 WL 3927648, at *1, 4. And to the extent that Seward & Kissel suggests that Barack should have investigated publicly available red flags himself, this Court rejects any such contention. Cf. Escape Airports (USA), Inc. v. Kent, Beatty & Gordon, LLP, 913 N.Y.S.2d 47, 49 (N.Y. App. Div. 2010) ("It is axiomatic that counsel 'may not shift to the client the legal responsibility it was specifically hired to undertake because of its superior knowledge.'").

Second, Seward & Kissel contends that the fraud perpetrated by ForceField and some of its senior management post-closing acted as an intervening cause for the damages to Barack. Under New York law, an intervening act is "deemed a superseding cause and will serve to relieve defendant of liability when the act is of such an extraordinary nature or so attenuates defendant's negligence from the ultimate injury that responsibility for the injury may not be

reasonably attributed to the defendant." Kush v. City of Buffalo, 449 N.E.2d 725, 729 (N.Y. 1983). However, when the intervening act is a "natural and foreseeable consequence of a circumstance created by defendant, liability will subsist." Kush, 449 N.E.2d at 729. And while an "intervening intentional or criminal act will generally sever . . . liability," this doctrine does not apply if the intervening act is reasonably foreseeable. Kush, 449 N.E.2d at 729. In this case, the crux of Barack's malpractice allegations is precisely that ForceField's criminal activity was foreseeable based on the red flag information that Seward & Kissel purportedly failed to uncover (see FAC ¶¶ 34-42), and was accordingly a foreseeable consequence of Seward & Kissel's negligence. Thus, Barack has also adequately pled the causation prong of his malpractice claim. See Winters v. Dowdall, 882 N.Y.S.2d 100, 101 (N.Y. App. Div. 2009) (holding that where counsel failed to properly investigate an entity prior to selecting it as an intermediary for an exchange transaction under 26 U.S.C. § 1031, the subsequent theft of the client's exchange funds by the entity "did not relieve [counsel] from the consequences of their own initial negligence").

III. Damages

Legal malpractice damages are designed "to make the injured client whole." Bua, 952 N.Y.S.2d at 598 (citing Campagnola v. Mulholland, Minion & Roe, 76 N.Y.2d 38, 42 (N.Y. 1990). The measure of damages for a legal malpractice action based on negligence in giving advice "is the difference in the pecuniary position of the client from what it should have been had the attorney acted without negligence." 76 N.Y. Jur. 2d Malpractice § 99; see also Flynn v. Judge, 133 N.Y.S. 794, 796 (N.Y. App. Div. 1912). Under New York law, "[c]onclusory allegations of damages or injuries predicated on speculation cannot suffice for a malpractice action, and dismissal is warranted where the allegations in the complaint are merely conclusory and speculative." Janker, 24 N.Y.S.3d at 185 (quotation marks omitted); Zarin v. Reid & Priest,

585 N.Y.S.2d 379, 382 (N.Y. App. Div. 1992) (affirming motion to dismiss pursuant to CPLR § 3211 where the damages claimed were "too speculative and incapable of being proven with any reasonable certainty").

Here, Barack alleges a loss of over $10 million, consisting of (1) the losses sustained on the transaction; (2) his subsequent repurchase and sale of ESCO at a "fire sale" price; (3) the notes; (4) the loss of his employment contract; and (5) the $150,000 in legal fees that Seward & Kissel charged him in connection with the ForceField transaction and the subsequent repurchase of ESCO. (FAC ¶ 49.) The parties' disagreement centers on the losses sustained by Barack on the transaction. Seward & Kissel contends that these alleged losses, which are essentially for lost profits, are speculative because Barack does not identify any actual bids or offers from prospective buyers of ESCO for over $10 million, but instead merely alleges that he had "interest" from other purchasers. Barack counters that he does not seek lost profits, but rather lost value damages based on the loss of ESCO's market value, measured from the time of the transaction.

But this Court need not wade into the thick of the parties' dispute at this juncture. Long v. Marubeni Am. Corp., 406 F. Supp. 2d 285, 301-02 (S.D.N.Y. 2005) ("A motion to dismiss is directed to the complaint, and not to the theories spun out in plaintiffs' opposition papers."). Accordingly, what matters for purposes of this motion are whether "the allegations actually plead[ed]" establish actual and ascertainable damages. Ifill v. United Parcel Serv., 04-cv-5963, 2005 WL 736151, at *4 (S.D.N.Y. Mar. 29, 2005). Barack alleges that had Seward & Kissel conducted adequate due diligence, he would not have proceeded with the transaction (FAC ¶ 4, 49, 51, 55). The Complaint also alleges that the fair market value of ESCO at the time of the transaction was between $8 million and $12 million. (FAC ¶ 49.) Taken together, these

allegations plausibly assert that consummating the ForceField transaction placed Barack in a worse financial position than the financial position he would have been in had he not proceeded and simply retained the value of his company.  See Flynn, 133 N.Y.S. at 796.

## CONCLUSION

Seward & Kissel's motion to dismiss is denied.  The Clerk of Court is directed to terminate the motion pending at ECF No. 26.

Dated: September 12, 2017
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.